**AFFIRM; and Opinion Filed July 7, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00261-CV

### IN THE INTEREST OF T.N.R., A Child

**On Appeal from the County Court At Law No. 1**
**Kaufman County, Texas**
**Trial Court Cause No. 91853CC**

## MEMORANDUM OPINION
Before Justices Francis, Lang-Miers, and Myers
Opinion by Justice Lang-Miers

A.P. (Father) appeals the trial court's final order in this suit affecting the parent-child relationship. In two issues, Father contends the trial court abused its discretion by ordering that (1) he receive limited supervised visitation only and (2) he have none of the parental rights listed in section 153.073 of the Texas Family Code. We affirm.

Father and J.R. (Mother) were involved in a relationship for several months in 2002 and 2003. Mother became pregnant and had a son, T.N.R., in October 2003. By that time, Father was in prison, and the two were no longer dating. After his release in 2007, Father moved to Indiana. After years of trying to locate his son, Father said he found him in Texas in February 2014 through Facebook and began communicating with him over the telephone.

A few months later, based on information on Facebook and from others, Father contacted the Texas Department of Family and Protective Services to report neglectful supervision and abuse of T.N.R. by Mother and her boyfriend. The referrals eventually led to T.N.R. being

removed from Mother's care and being placed with his maternal grandfather. A.P. was adjudicated T.N.R.'s Father. The Department established service plans for both Mother and Father, but eventually decided to seek termination of both parents' rights to T.N.R.[1] Father moved to Texas, obtained employment, and countersued for sole managing conservatorship.

At the trial, much of the evidence focused on Father's two-decade history of aggressive behavior, all of which Father denied. Mother testified that during the time they were together, Father physically abused her on multiple occasions, once while she was pregnant. She testified generally that Father hit her with his open hand and once beat her with the buckle end of a belt. In one incident, Mother said Father knocked her to the ground and beat her head into the concrete, leaving her with temporary amnesia and causing her to have seizures to this day. Mother was hospitalized, and Father did not visit her once. Father denied the incident and claimed he tried to help Mother when she went into a seizure from a drug overdose. He claimed that when Mother "came to," she punched him and asked what he did to her. A "mob of witnesses" had gathered, got mad at him, and called the police.

In February 2003, Mother agreed to go with Father to a relative's funeral in Indiana. The trip was supposed to last a few days. Once there, Mother said Father would not let her leave or use a telephone, and he assaulted her. After about ten days, Father left the residence and Mother was able to contact her family. The police were called. When they arrived, Father refused to let them in. The police busted in the door and found Father hiding under the bed using a child as a shield. Father was arrested for criminal confinement, battery, and intimidation and was held in jail until he was extradited to Texas for violations of his deferred adjudication probation for injury to a child.

---

[1] The suit also involved Mother's parental rights to a second child, who also was being cared for by her maternal grandfather. This appeal does not involve any issues relating to that child, nor does it involve any issues related to Mother's parental rights to T.N.R.

Father had been charged with two first-degree felonies of injury to a child after he beat his sister and her friend, who were both thirteen years old, in November 2000. According to the Dallas police report, Father hit his sister several times with his closed fist; he hit and kicked her friend and held him off a three-story balcony. As a result of the beatings, both had "severe injuries" and were hospitalized. The sister had a broken shoulder or arm, a busted lip, knots on her forehead, and a bloody nose. The friend's left eye was swollen, his ear was purple, and he was having problems with his neck and difficulty breathing. At the hospital, he had to be fitted with a catheter and a neck brace. Father pleaded guilty to the charges and was placed on deferred adjudication probation. After his return to Texas, he was adjudicated guilty and sentenced to five years in prison.

At the trial in this case, Father denied hitting either child. He said he entered the house that day to find police officers beating his sister's mother. When he tried to intervene, the officers told him to stand back, he refused, and was arrested. He also claimed he was later adjudicated and sentenced to prison because he grew tired of being wrongfully accused of violating his probation, so he told "Judge Stinky" to send him to prison. He also denied holding Mother against her will in Indiana.

Other evidence of Father's aggressive behavior—from testimony and forty-six pages of South Bend police reports—included the following:

- In March 1998, police were dispatched to a fight between Father and Tasha Fultz. When they arrived at the residence, Father was lying in the yard with a stab wound to his shoulder; Fultz had a "fat lip" and "blood all over her face." Neither suffered a serious injury, but were treated at the hospital. Fultz told the police that Father came to her house and "started to go crazy." She said he started "yelling and swinging at her." She got a knife to defend herself. Fultz said Father punched her repeatedly in the face with his fist, and she stabbed him in the shoulder. Father grabbed the knife, held it to her head, cut her eyebrow, and said, "I'm gonna kill you bitch." Police closed the case when they could not get in touch with Fultz but forwarded a copy of the report to prosecutors for their review. At trial, Father said Fultz's name "doesn't ring a bell." When asked if he

remembered an incident where she ended up with a bloody face, he said, "I don't know."

- In March 1999, police were dispatched to an auto theft/assault call and found Father's ex-girlfriend, Rosa Molina, lying on the side of the road bleeding from her head. Molina reported that while she was driving, she and Father got into an argument after Molina told him she might be pregnant. Father hit her with his fists, pushed her out of the car, and then got into the driver's seat to leave. Molina's child and cousin were in the back seat, so Molina jumped on the hood to prevent him from leaving. Father accelerated and then hit the brakes, knocking Molina off the vehicle, causing her to hit her head. Father saw that Molina was bleeding and fled the scene. Molina suffered a concussion and lacerated forehead. She was taken to the hospital for treatment. The police report stated that Molina's cousin verified her account. At trial, Father said the incident "never happened."

- In November 1999, David Patterson reported to South Bend police he was doing yard work when a man and woman started walking across his property. Patterson, who was carrying a flashlight, told the two they were on his property. The man, identified by photo array as Father, grabbed the flashlight, hit Patterson in the face with it, and fled. Police forwarded the case to the prosecutor's office for review.

- In 2009, Father was arrested for resisting arrest and domestic violence involving the mother of his seven-year-old son, who lives in Indiana. Father testified the incident involved keys he had left at her house. He acknowledged that the police took him to jail, but said it was only because he and the woman had a child together. He said he was released from jail within twenty-three hours and "[n]othing ever came about" because of it.

- In November 2010, police were called to a burglary. Sherika Sullivan, an ex-girlfriend, reported she and Father argued, and Father took her grill and threw it into the garbage. He also threatened to blow up her car. Sullivan left and drove around for a while. When she returned, she hid her car and went into her home, where she found that a brick had been thrown through her living room window. Several photographs were torn, and her purse was missing. A witness told the police that she saw Father throw the brick and then run away. Father reportedly moved back into the residence the next day, and Sullivan told police she did not want to take further police action. At trial, Father said Sullivan attacked him and the police came to his rescue. He denied throwing a brick through the window or tearing up her house.

- In July 2011, police were called after Father reportedly pushed his own father to the ground and punched him three times during an argument. Father denied this incident. To explain why his father would make such an allegation, he said his father was a "little ornery."

- In September 2014, police were called to an Arby's restaurant in South Bend, Indiana, after Father allegedly threatened to kill the manager when she failed to

provide service quickly enough. Although Father testified he called the police, the police report showed that the restaurant manager called. The officer told Father to leave the property, and Father did.

- A Department caseworker testified that during the pendency of this case, Father tried to intimidate her by telling her he had a previous caseworker fired and was working on getting another fired.

In addition, Father had previously been arrested for public intoxication and possession of marijuana. There were also allegations, in 2013 and 2014, of theft and drug activity in the home where Father was living. At trial, he denied any responsibility in any of the above incidents. In fact, he testified he does not hit women, children, or men. He said he has changed since his younger days and while he gets angry, he manages it differently. He also said he had been sober for more than a year.

Donald S. Chandler, Jr., who has a Ph.D. in psychology and is a licensed professional counselor, performed a psychological evaluation of Father and counseled with him under a contract with the Department. Chandler testified he believed Father had a low probability for substance abuse issues that would affect his parenting. He also believed Father had a low risk for criminality or violence that would affect his parenting. He did not believe, however, that Father should be T.N.R.'s sole provider. Rather, he believed it was in T.N.R.'s best interest that Father continue family counseling with T.N.R. for anywhere between ninety days to six months. When asked about the level of supervision required for contact between the two, Chandler said it "wouldn't be for me to make that determination." When pressed, Chandler agreed that he was only recommending "continued services, continued supervision and monitoring of the contact."

Dr. Greta Kirwin, a licensed psychologist, performed a bonding assessment on Father and T.N.R. and said T.N.R. was excited about getting to know his father. She was concerned, however, that Father minimized his criminal history and had a history of aggression. Father could not identify treatment goals, which she would have expected him to do at this point in the

process. She also believed there was no data to support Chandler's opinions that Father was a low risk for future violence and criminality. According to Kirwin, Father's denial that he committed injury to a child after pleading guilty to the charges indicated a "lack of insight, lack of accountability, lack of progress." She said she would not recommend family therapy if Father could not identify treatment goals and did not believe it was in T.N.R.'s best interest to be around him.

Erica Leary, the Department's investigation supervisor in this case, testified the Department became involved as a result of Father's reports of abuse and drug use in Mother's home. He also told Leary he wanted custody of T.N.R. and met with her at the CPS office. When Leary checked his criminal history, she learned he had been involved with law enforcement dating back to 1997 when he was nineteen years old. Leary testified that Father's past presented a concern as to whether he would be able to provide a protected, stable home. Ultimately, she determined that Father would not be a "safe" placement.

Belen Fuentes, who was assigned to the case a week after the Department was named temporary managing conservator, testified that in most of the scenarios in which Father had been physically aggressive or violent, he could have removed himself but did not. She said she was concerned because when T.N.R. reaches his teenage years, he may go through a "rebellious period," and she questioned whether Father had the "thought process" to handle the situation differently, particularly when "years of history show he has been aggressive when something upsets him." Based on the facts and circumstances, she recommended that Father, at most, be allowed supervised access to T.N.R.

Finally, during the course of the proceedings, the trial court interviewed T.N.R. in chambers. T.N.R. told the court he preferred to stay with his Mother, but if he could not, he wanted to live with his Father and then his maternal grandfather.

After hearing the evidence, the trial court denied the Department's request to terminate Father's rights to T.N.R., ordered the child to remain in the home of his maternal grandfather, and named Father possessory conservator with limited supervised access. The trial court did not allow Father any parental rights listed in section 153.073 of the family code.

In reaching its decision, the trial court noted it had the "same concerns" as the Department and guardian ad litem about Father having "unfettered access" to the child but said "whether visitation is later on expanded or whether the court totally eliminated access" will depend on how the visitations go and "whether there's any problem or whether [T.N.R.] suffers any adverse affects [sic] from the visitation." Father appealed.

In his first issue, Father contends the trial court abused its discretion by varying from the terms of a standard possession order and allowing him only limited supervised visitation.

There is a rebuttable presumption that the "standard possession order" prescribed by the family code provides reasonable minimum possession of a child for a parent named as a possessory or joint managing conservator and is in the child's best interest. TEX. FAM. CODE ANN. § 153.252 (West 2014). However, the trial court is permitted to place conditions on a parent's access, such as supervised visitation, if necessary for the child's best interest. *In re K.S.*, No. 14-15-00008-CV, 2016 WL 1660366, at *8 (Tex. App.—Houston [14th Dist.] Apr. 26, 2016, pet. filed); *see* TEX. FAM. CODE ANN. §§ 153.193, 153.256 (West 2014).

We review the decision for an abuse of discretion. *See In re L.C.L.*, 396 S.W.3d 712, 719–20 (Tex. App.—Dallas 2013, no pet.). A trial court abuses its discretion only when it acts unreasonably, arbitrarily, or without reference to guiding rules and principles. *In re M.P.B.*, 257 S.W.3d 804, 811 (Tex. App.—Dallas 2008, no pet.). A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support its decision. *In re S.E.K.*, 294 S.W.3d 926, 930 (Tex. App.—Dallas 2009, pet. denied).

To support his contention that the trial court abused its discretion, Father directs us to evidence that he has unsupervised visitation with his seven-year-old son, who lives in Indiana. But Father had not seen that child in more than a year, since he moved to Texas to attempt to gain custody of T.N.R. Father also states he attends church regularly, has been sober since October 2013, is gainfully employed, and was adjudicated T.N.R.'s father due to his "actions to find T.N.R." He also relies on evidence from Dr. Chandler that he has a low risk for criminal behavior in the future and that his only conviction, for injury to a child, was fifteen years ago.

In contrast to evidence favorable to Father, there was extensive evidence that was not favorable—specifically, Father's lengthy history of aggressive, violent behavior. This history included convictions for injury to two children, both under the age of fourteen, assaults on ex-girlfriends and his own father, and threats against an Arby's manager. While some of these incidents occurred years ago, others occurred during the previous five years. In fact, the incident involving the Arby's manager occurred during the pendency of this case. And while Father denied all of the allegations, the trial court was in the best position to resolve any conflicts in the evidence. Additionally, it was Father's refusal to accept responsibility in these incidents that caused concern among the professionals involved in this case. Dr. Kirwin believed Father's denial showed a lack of insight, accountability, and progress. Fuentes, the caseworker, questioned whether Father had the "thought process" to handle differently any future situations involving his son. Both opined that it was not in T.N.R.'s best interest to be around Father unsupervised. Even Dr. Chandler, who testified most favorably to Father, would only recommend "continued services, continued supervision and monitoring of the contact." Finally, this evidence must be considered in the context that Father has only recently entered T.N.R.'s life, so there is little evidence to gauge Father's ability to manage his anger while parenting a pre-teen or teenage son. Considering the evidence in this case, we cannot conclude the trial court

abused its discretion in requiring Father's visitations with T.N.R. to be supervised by a third party. We overrule the first issue.

In his second issue, Father contends the trial court abused its discretion by ordering that he have none of the parental rights listed in section 153.073 of the family code.

Section 153.073 provides that a parent appointed as a conservator of a child has certain rights at all times "unless limited by court order." TEX. FAM. CODE ANN. § 153.073. These rights include receiving information from a conservator about the child's health, education, or welfare of the child; access to the child's medical, dental, psychological, and education records; consulting with the child's physician, dentist, or psychologist; consulting with school officials about the child's welfare and education status; attending school activities; being designated as an emergency contact; consenting to medical, dental, and surgical treatment during an emergency involving an immediate danger to the child; and managing the child's estate. *Id.*

Father argues the trial court's decision should be evaluated "under an exacting standard" and the denial of such rights should be allowed in only "extreme" circumstances. As support, he relies on a case involving a wholesale termination of parental access and visitation rights under a modification order. *See In re M.S.R.*, No. 13-05-493-CV, 2007 WL 3228072 (Tex. App.—Corpus Christi 2007, pet. denied) (mem. op.). Here, Father has not been denied complete access to his child. Although Father argues that evidence of his "self improvement and efforts" to become a good father entitle him to the rights set out in section 153.073, the contrary evidence recited above support the trial court's order. We overrule the second issue.

We affirm the trial court's order.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

160261F.P05

–9–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

IN THE INTEREST OF T.N.R., A CHILD

No. 05-16-00261-CV

On Appeal from the County Court At Law No. 1, Kaufman County, Texas
Trial Court Cause No. 91853CC.
Opinion delivered by Justice Lang-Miers; Justices Francis and Myers participating.

In accordance with this Court's opinion of this date, the trial court's final order in suit affecting parent-child relationship is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 7th day of July, 2016.